Demetri Eglitsen, Airline Pilots Assn. v. NLRB Russ Bailey, Airline Pilots Assn. v. NLRB Alp obtained a letter of agreement that contained a scope clause, which is common in the airline industry. At that time, DHL was a small carrier, and the pilots agreed that it was in their interest to take present concessions in exchange for a commitment to be able to grow with the airline. And again, this is typical of the airline industry. Among other things, this letter of agreement stated that if there were disputes over the commitments made by DHL to ALPA, those disputes would be resolved by a panel of arbitrators known as a system board of adjustment upon the filing of a grievance, and these are Railway Labor Act procedures. Years later, when DHL acquired another company, Airborne, ALPA attempted to invoke its contract right by filing a grievance. DHL responded by filing a lawsuit against ALPA, arguing, among other things, that the dispute was within the exclusive jurisdiction of the National Mediation Board under the Railway Labor Act. At that point, a third company, ABX, also a Railway Labor Act carrier, filed an unfair labor practice charge against ALPA, arguing that because of a completely fortuitous circumstance, the fact that although ALPA has 62,000 Railway Labor Act-covered employees, it also had at that point 17 members who worked for an airline called Ross Aviation that had stopped being a common carrier because all it did by this time was transport spent nuclear fuel for the federal government. So Ross Aviation, over the years, had ceased to be covered by the Railway Labor Act, who was now technically an employer under the National Labor Relations Act. Well, okay, so you have two issues. You have the 17 employees. Right. And then you have these acquisitions that went on that arguably transformed DHL from what it initially was when it started until where it was when the dispute occurred. Right. All right. And I want to address the – From a present-day standpoint of where it is, would you concede that DHL is an employer under the National Labor Relations Act? Well, you know, I think it's hard to look at what DHL is because it's in the airline industry, but apparently what DHL is now is a holding company that operates in the airline field. I think technically it probably is an employer under the National Labor Relations Act. I would concede that sort of if you look at the statute. And I appreciate you reminding me to tell you. I want to address the jurisdiction issue first. Well, I think the jurisdiction issue is really important. So if that's the case that they're an employer at this particular juncture now, why does that fact not give the NLRB jurisdiction over the controversy? Because obviously if this is a pure RLA act and they don't have jurisdiction, then that's – I mean, that's the ballgame. And I think the answer is that the Jacksonville Terminal Company case, the Supreme Court, says you don't look at the technical definition in this case of ALPA technically is it a labor organization. DHL is clearly for the purposes of this analysis an NLRA employer. But what Jacksonville Terminal says is – But there were no NLRA employers in Jacksonville, right? Well, you know, what's interesting about that is one imagines that there had to be, but certainly the Supreme Court doesn't address that fact. The Supreme Court says you have a dispute between a traditional railway labor organization and a carrier. But in any dispute where a traditional railway labor organization is, for example, picketing a railroad or an airline, there are going to be all kinds of suppliers, companies providing services, which are NLRA employers who presumably are impacted by that picketing. But I agree, we don't get all the way to where I think we need to go by Jacksonville, Brotherhood of Railroad Trainmen versus Jacksonville Terminal. I do think, however, that the IBT versus Western Pacific Railway case extends Jacksonville Terminal explicitly and says, and I'm quoting now, plaintiffs argue that the Railway Labor Act does not apply because one of the defendants' transport is not a railroad. However, it is necessary to look at the substance of the dispute. Viewed from this perspective, the case is essentially a railway labor dispute between the railroads and certain of their employees. Now, the way the Labor Board analyzes this dispute, it's a dispute between ALPA, the traditional railway labor organization, and ABX, a rail carrier. It seems to us the way the Supreme Court looks at that is to say that is an RLA dispute. And up until the unfair labor practice charge was filed, everyone assumed it was an RLA dispute. So the question is, if you have a traditional railway labor organization in a dispute with a traditional, with an RLA carrier, and there is some collateral impact on an NLRA employer, does that take it out of the world of RLA disputes and suddenly give the NLRB jurisdiction? And what's vital to remember, and the reason I keep coming back to the 17 Ross employees, is that if there were no 17 Ross employees, then everyone agrees it wouldn't matter. The collateral damage, if you will, on the NLRA employer would not give the NLRB jurisdiction. What I keep coming back to in my mind, thinking about the majesty of our legal system, is that results and outcomes in cases are supposed to be determined by something significant. We're supposed to have a reasoned way of saying the consequences to ALPA of what it did in 2004 shouldn't be dramatically different from what the consequences would be to ALPA in 2007 if the only factual distinction is 17 completely uninvolved Ross aviation pilots who existed in 2003 and 2004 who may no longer be represented by ALPA in 2007. I keep trying to find, and I'm reading the briefs and I see the discussion of the terrible impact that this could have on the neutral NLRA employer or the impact it could have on ABX. But if it were not for those 17 Ross pilots, then there is no question that the Labor Board would not have jurisdiction in this case. But you don't think they're making a little more nuanced argument in terms of that it's not just the 17, that they're also arguing that by virtue of where, you know, after the acquisitions and all of that, that that transformed DHL? No, I don't think that. I think everyone agrees that if the ALPA had not had those 17 employees, it would not be a labor organization as defined by the National Labor Relations Act. And therefore, it would not come within the jurisdiction of the National Labor Relations Board. And I invite you to ask opposing counsel that question because I'm confident that they will concede that. The only reason that the Labor Board, which in general has and always has been. This is 17 out of 62,000. 17 out of 62,000. If it were not for those 17, counsel for the Board will concede that there is no unfair labor practice charge against ALPA. There is no complaint issued. There is no administrative law judge issuing a decision. And there is no remedy ordered because Congress enacted the Railway Labor Act long before it enacted the National Labor Relations Act and made it repeatedly clear, and the Supreme Court's made it repeatedly clear that the world of railroads and airlines is a separate industrial world. And we see a lot of facets of that in this case. I mentioned the scope clause, which is unique to the rail and airline industry. But it's also unique to the fact that in all of the cases the Board is using to discuss issues like fairly claimable. They're looking at specific locals with geographic jurisdiction. But, of course, in the airline and railroad world, you have national jurisdiction. The ALPA pilots fly for carriers throughout the United States and, in fact, around the world. It's structured in a completely different way. And as you may be aware, the Railway Labor Act makes it extremely hard for a union to strike or for a carrier to lock out its employees.  But then if those, the carrier and the union, are released to engage in economic activity, they are completely free from the constraint against engaging in secondary activity. Right. And that's the problem here is that when you have secondary activity directed to an entity that is covered by the NLRA. But, again, what I can't get around is the fact that if ALPA was only a rail, only represented railway employees, then it wouldn't matter. Go ahead. Oh, I'm sorry. Does the side agreement that after the acquisitions, does that side agreement, how do you factor that into anything? Well, the side agreement is simply a contract between DHL and ALPA that ALPA has attempted to enforce. And it's our position that whether ALPA wins, ALPA loses, whether the System Board of Adjustment says, for example, you know, you're not going to get all of the work you're asking for because it's not practical and we don't read the agreement as requiring DHL to do it, that is the historically accepted procedure for resolving disputes between airlines and that airline's employees. And I can't get past the fact that in this case, what we have is a dispute between an airline and ALPA's employees who work for the airline. And as looking again at the board's rationale for serving jurisdiction, they say, well, it's really a dispute between the ALPA employees of one carrier, ASAR, and the effort to get work from another carrier, ABX. But that is, everyone agrees, is meant to be governed by the Railway Labor Act, again, but for this fortuitous existence of these separate laws. Well, it's a twofold. I don't know whether you'd call it fortuitous or not, but there's a twofold problem. You have a labor organization. That's what you're talking about. But also, I don't think there's much dispute that DHL Holdings is governed by, is an LRB employer, which is different from Jacksonville and other cases. Well, it's not different from the IBT versus Western Pacific Railroad case. And I guess one thing that's hard to maybe get our minds around is this. The board's analysis of this kind of dispute, which is the basis for their assertion of jurisdiction, is not that there is a dispute between ALPA and DHL, a dispute between a traditional railway union and an NLRA employer. If you read the board's decision, and this is consistent with the way the board looks at these kinds of cases, what the board says is there is a primary dispute between ALPA and ABX, between a traditional railway labor organization, ALPA, and a Railway Labor Act carrier. And in that primary dispute, DHL, an NLRA neutral, is somehow brought into the fold, is going to be injured by that dispute because in ALPA's effort to get ABX's work, it's going to injure DHL by forcing it to change the way it does business. That's the justification the board says in explaining why ABX is a primary target and DHL is a neutral secondary. Now, if the board wants to concede that DHL is actually a legitimate primary target, then it's a different story. But that's not how the board, either in this case or traditionally, looks at these disputes. So if, in fact, and we see that there is a dispute between ALPA and ABX over who's going to get the cargo that's being shipped on ABX. Is it going to be ABX or is it going to be ASTAR, another Railway Labor Act carrier? I keep coming back to that, since I think it's appropriate to ask the question of whether the board's assertion of jurisdiction is appropriate. What the board is saying is this. If ALPA did not have those 17 employees at Ross Aviation, then ALPA would not be a labor organization. ALPA would be a rail covered exclusively by the Railway Labor Act. And anything that ALPA did would be immune from board jurisdiction. Because of those 17 employees, who at that time existed 17 out of 62,000, suddenly. Why does that make any difference, 17 out of 62,000? I mean, 17 is 17 in terms of jurisdiction, right? Well, but you see, that's why we get back to Jacksonville, Brother of Railroad Treatment and Jacksonville Terminal Company, which talks where it says the organizations must be deemed pro tanto exempt from the NLRA. What the Supreme Court is saying is it's not a question of there is jurisdiction or there isn't jurisdiction. There's a question of how do you reconcile the scope of these two laws? The Railway Labor Act here, the National Labor Relations Act here. And the choice which has to be made is do we say that so long as one of 62,000 members, totally unrelated, obviously, to the facts of this dispute, so long as one of those members is covered by the National Labor Relations Act, then everything moves from the Railway Labor Act to the NLRA. But if Ross, for instance, had 17,000 employees, none of whom was involved in this dispute, and Ross was in no way involved in this dispute. It wouldn't make any difference to my argument. It wouldn't make any difference, right. Correct. Because what it seems to me what the Supreme Court is saying and what the Ninth Circuit is saying in the Western Pacific Railways case is you look to the substance of the dispute. Right. So it doesn't make any difference whether it's 17 or 17. That's right. But it certainly is a nice fact for me to be able to throw at you repeatedly because it emphasizes the irrationality. When you get to the eighth time, I think. Fair enough. But it does emphasize the arbitrariness and irrationality of it, as opposed to the test which the U.S. Supreme Court has adopted and this Court in talking about look at the substance of the dispute, that it is essentially a Railway Labor Act dispute. You have about five minutes left. I will reserve that. Thank you. Good morning, and may I please the Court. My name is Jason Waldo, appearing again on behalf of the National Labor. Nice to see you again. Nice to see you again. We had another case that someone else came in. I understand that you three are getting kind of a crash course in the National Labor Relations Act this week. That's why we group cases. But I'm here representing the National Labor Relations Board. I would like to reserve five minutes to address the issue. I'm going to be arguing for Mr. Cohn, who is sitting at counsel's table with me. He's going to be arguing on behalf of the intervener, ABX. Although this case involves a complicated and rather exotic set of facts, the underlying conduct at issue fits very comfortably within the NLRA's prohibitions on secondary activity found in Sections 8b-4-2 and Section 8e. More specifically, the Board found that ALPA, which is a statutory labor organization, violated those provisions by attempting to enforce an agreement that would require DHL Holdings, a neutral secondary entity, to cease doing business with ABX, a primary entity with which ALPA had a labor dispute. The Board's order is entitled to enforcement because ALPA plainly sought to force DHL Holdings to sever its dealings with ABX, whose employees, by the way, are represented by another union, the Teamsters, for reasons that cannot be justified by legitimate effort to preserve work for its members. Furthermore, ALPA fails to show that the Board abused its discretion in asserting jurisdiction over the matter. Well, I guess what I would be saying, if there weren't these 17, do you concede that the Board would not have jurisdiction? Well, Your Honor, there are several pieces of the puzzle that if you took any of them away, there would be no jurisdiction. So the answer is yes? The answer to that is yes, and likewise, if DHL Holdings were not an employer and were instead a carrier, then we would, at that point, be in the realm of Jackson Terminal, and we would not be asserting jurisdiction there. But here you have two elements that come into play that are absolutely crucial. You have, on the one hand, a labor organization, and the labor organization must be analyzed in terms of its entire composition, not just the employees who are employed. I guess when I asked the ALPA lawyer that was it just the 17, he said, yeah, it's just the 17. As far as we know. No, but he said that you would concede that that's the whole basis for what you're asserting jurisdiction. But then I said, well, what about DHL? And are you taking that as part of the component as to why this is not a pure RLA dispute? Well, Your Honor, exactly as you said, the labor organization component isn't the entire picture. But, yes, if there were no. You need both. I need both. And I have both. But if there were no NLRA-covered employees in ALPA, then I do have to concede that this would be a case, and under this Court's own law in the Marine Engineers case, if there are no NLRA-covered employees in the union, then they are outside the scope of the secondary conduct prohibitions, fortunately for me. I have both of those elements. I have a labor organization within the meaning of the Act by virtue of the 17 NLRA-covered employees at Ross Aviation. And I also have DHL holdings, which is, and it's not a matter of, there's no question about it. Was DHL an employer before the acquisitions occurred? Before the acquisitions occurred, I don't know if we have any agreement on that. But we do have undoubted agreement on it. There's really no question. There's a stipulation to this effect at page 23 of the exerts of the record, which is that DHL holdings is a statutory employer under the NLRA. So there's really no question about that that can be raised at this point. Sotomayor, so why should the nature of a dispute be changed from an RLA dispute to an NLRA dispute simply because of a completely irrelevant fact of the 17 Ross employees that have nothing to do with this dispute? Well, Your Honor, I would argue that it's not an irrelevant fact, that you look at the dispute between ALPA and ABX, which is the type of dispute covered by the Railroad Labor Act, and why should, in this case, the 17 Ross employees make a difference, which in another case did not involve any NLRA employees at all, would change the character of the dispute? Well, Your Honor, when you're speaking in jurisdictional terms, there are bright lines that need to be drawn, and when the standard is that you look at the entire composition of the labor organization issue. So you're saying that that what some people might call an irrelevancy should have this significant dispute on the character, the significant impact on the character of the dispute? It does have a significant impact on the character of this dispute. And aren't there — wasn't the Railway Labor Act created to give certain means of solving disputes between Railway Labor Act employees and Railway Labor Act companies that an irrelevant 17 or 17,000 Ross employees have nothing to do with? Doesn't Jacksonville Terminal tell us to look what's involved in the case rather than the dressing, irrelevant dressing around the case? Well, Your Honor, there's a lot to unpack in that. First of all, the RLA does not condone specifically the activity that they've undertaken here, and if this was just a matter of a dispute entirely between the ALPA-represented employees at ASTAR and the company of ABX, there would be no issue here. What brings this within the NLRA's jurisdiction and what makes it problematic under the NLRA is this agreement that's being used as a bludgeon to leverage ALPA's position in the primary labor dispute. Well, I mean, the dispute would be solved one way or the other, but since it's an RLA dispute, shouldn't it be decided through that channel rather than through the NLRA channel? And I'm not saying I'm sympathizing with ALPA's position, but the method by which the dispute is going to be decided, since it's basically an RLA dispute, shouldn't that channel be selected rather than your channel? Well, Your Honor, I would say no, and I would say that the Supreme Court has acknowledged the fact that the amendments that occurred in the NLRA that added the secondary provisions and that were later amended to include 8E were directed at protecting not just employers under the Act, but also reaching out to statutory persons that include RLA carriers, as the Supreme Court said in Steelworkers, that Congress meant to extend RLA carriers, quote, the same protections which other employers enjoyed. And in the Teamsters Local 25 case, they said, since railroads are not excluded from the Act's definition of person, they are entitled to board protection from the kind of unfair labor practices prescribed by Section 8B. Well, I always like to sort of look at people's motivations just to understand why people are saying things. And obviously, the secondary boycott is the big problem here, right? Oh, absolutely. I mean, because it's, you know, to one side, it's an advantage. To the other side, it's a disadvantage. And, you know, for us not looking to the, you know, I mean, we don't, you know, we're not resolving what the problem is between these two people. We're just saying where it's got to be. And obviously, ALPA doesn't want to be over with the NLRB because they get hit with the secondary boycott, right? Correct, Your Honor. That under the NLRA law, they have employed an unlawful means. And there are other people that would love to be over there because they've got the hammer of the secondary boycott. But that — Correct. And on the flip side of it, if you're outside of the NLRA entirely, ALPA has this bludgeon that they've — Right. There's no analog under the Relative Labor Act. That's correct, Your Honor. So it's a perfectly legal activity under the RLA, but a prohibited activity under the NLRA, right? Correct, Your Honor. So the jurisdictional issue decides the case, really? I believe so. I think that they've made some arguments about whether it's lawful work preservation or not. And we can certainly get into it, but it is certainly a case where it largely turns on the assertion of jurisdiction. And there are certainly interested parties on both sides. But I will say that this case is unlike a Jacksonville terminal, not only on the merits, but in the context in which it was. So why aren't you an interested party? What's your interest in all of this? Well, our interest is — our interest is in administering the Act and in asserting jurisdiction where we have an interest in doing so. And this is a case that was — where it was first — the complaint was approved by a general counsel. There are no private rights of action in front of the NLRB. So there is a general counsel who exercises what amounts to prosecutorial discretion. He first approved that complaint, feeling that there was a sufficient interest of the Board at stake. And then the case went to the Board, and the Board does have discretion. And I think even the dissenting Board member who argued against the assertion of jurisdiction here didn't do so on the basis that it was improper to assert jurisdiction here, but rather did so on the basis that it was unwise and maybe not the best exercise of the Board's discretion to assert jurisdiction here. But she did not say that it was improper. And a majority of the Board felt that there was a sufficient NLRB — I'm sorry, NLRA interest at stake that jurisdiction should be asserted. Well, that's — it's interesting because you talked about jurisdiction and bright-line rules. But really, your argument is the NLRB has discretion to exercise jurisdiction. Well, we do have the discretion to exercise — And you're asking us not to say it's jurisdictional or not. You're asking us to say, well, it's not an unreasonable and abusive discretion to exercise jurisdiction, right? That is certainly the case here. And had the Board decided to — within the exercise of discretion to say, technically this falls within the language of the Act and this is indeed a labor organization of the Act, but we just don't think we have a sufficient stake here, that's a decision they could have made and it would have also been entitled to deference as well. Well, there's also been this, you know, sort of floating out there, this motion to amend or, you know, I don't know, something, and I suspect to get the 17 out or whatever. So what if that is, in fact, the facts now? A little too late? Or, you know, obviously you're strenuously opposing that, but — Well, we opposed it on a very justifiable ground, which was that that was never information that was presented to the Board. And when I get up here as Board counsel, I am limited by Chenery to make arguments that the Board itself made. And when new facts are injected, my hands are tied. Well, what if those really — let's assume those are the new facts. Then why shouldn't we — and let's say we agree with the 17. Why shouldn't we then remand it and let them say that there aren't those 17 there anymore and then it's a different case? Well, Your Honor, the beauty of the way the Board proceeds in these things is it first makes a — The beauty. Okay. We'll call it the beauty in this instance. Or at least it does have a beneficial effect in this instance, which is that the Board first makes a finding of liability and issues a general order. And then another proceeding occurs where there — again, it's called a compliance proceeding. So it's kind of — it's almost like splitting up a trial into a liability and a damages phase. And that any modifications that need to be made to — or any interpretations of the order that need to be made in light of new circumstances or changed circumstances can be done by the Board when it's exercising its discretion to enforce remedies that — Of course. Well, sure. But beauty is in the eye of the beholder. And I expect the union may say, well, we still have a liability finding here that we shouldn't have because clearly now there's no jurisdiction. Well, I don't think that even if — even if the 17 employee — the 17 NLRA- covered employees were removed since the Board's order issued, that doesn't change the fact that the conduct was unlawful — I don't think you're going to let go. — was unlawful at the time. So that there is a valid finding of liability based on the facts that existed at the time the unlawful conduct took place. Now, there may be aspects of the Board's order that are — have less significance in light of these new facts, if indeed those facts are true. But that's something that can be resolved in a subsequent compliance proceeding. And I would submit that that's the proper venue to address those issues. But the fact that these employees were taken out of the union actually highlights something that's a bit interesting about the case, which is that the union is in many ways the master of its own affairs. It has the ability to decide whether it is an NLRA-covered labor organization or not. Other unions deal with this by having separate locals where, say, public sector employees are in those, or where agricultural sector employees are in those, or where, you know, RLA-covered employees. That's what the Teamsters does. They have both NLRA-covered employees and RLA-covered employees. And some of those are in some locals, and the RLA-covered employees are in other locals. So they can be the master of their own affairs here. They constituted their union in the way that they did and exposed themselves to this liability by having a mixture of NLRA-covered and RLA-covered employees and becoming a labor organization under the NLRA. But isn't the teaching of Jacksonville that we look at we step back and take a look at the disputed issue and see what's the nature of the dispute is? And here it seems like it's an RLA dispute at its core. Well, Your Honor, I look at Jacksonville Terminal and the proton to exemption that they announced there is kind of a three-legged stool. You have to have all three legs for the exemption to stand up. And several of the legs are present here. You've got the traditional railway labor organization. There's no dispute that Alpha fits the bill there. Acting on behalf of employees subject to the RLA, you also have that here. But the third leg of the three-legged stool is that it has to be in a dispute with carriers subject to the RLA. And this is not just that. You have more than that. You have a dispute also covered by the NLRA. And that's the problematic dispute that is the secondary dispute that embroils a neutral employer into the primary dispute between the labor organization and the RLA carrier. And for that reason, this falls squarely within the language of Section 80, which prohibits certain agreements between a labor organization and an employer that cause it to cease doing business with a person, which in this case includes a railway carrier or an airline carrier in this case. I'm sorry. I do want to oh, it looks like I'm out of time. I'm cutting into Mr. Cohen's time. So I'm going to cede the rest of my time. I just asked for it. Thank you. You're considerate as well as having beauty to your argument. May it please the Court. Thank you, Your Honor. I'm Charles Cohen of Morgan, Lewis & Bacchius and appearing on behalf of Intervenor ABX-AIR. To answer the question that's been asked of other counsel, indeed, ALPA must be a labor organization in order to be violating the NLRA. But let's go back to this proceeding. In the proceeding, ALPA conceded that it was a labor organization within the meaning of the Act. There was, therefore, no need to probe that issue any further. So where is that concession? Cited on page 40 and 41 of our brief, if I might, which has the record reference in it. ALPA cannot have it both ways. ALPA has in the past availed itself of fouling unfair labor practices at the NLRB. That's found on pages 5 and 6 of our brief. ALPA in 1975 was found by the NLRB in the Douglas Aircraft case specifically to be a labor organization within the meaning of the Act. With that kind of checkered history and with a concession, there was no need to So this is not necessarily dependent on 17 employees, but rather on labor organization status, which, as I stated before, is indeed necessary. So then that being the case, is that the end of the inquiry, or do we still have to look at the Jacksonville terminal case? It certainly, Your Honor, is an issue in the case. And But it's not the end of the inquiry, right? It's not the end of the inquiry. No, I do not believe that it is the end of the inquiry, but let's take a look at this impact. This is a very dramatic secondary boycott, one of the magnitude that one rarely, if ever, sees. Under this, 750 Teamster-represented pilots would be losing their positions if this grievance were upheld. There is a tremendous impact on DHL, I believe conceivably. Okay, but if they didn't have those 17 people, you'd still have the same problem, right? The problem, if they weren't a labor organization, we would have the same problem. But ALPA chose to contract with an employer who became an NLRA employer. It then sought to enforce that agreement. It has to be responsible for the reasonable consequences of its actions. When it did so, it violated Section 8B-4A and 8B-4B of the National Labor Relations Act. In terms of the fact that Your Honor raised the changed circumstances situation, the NLRB acts in the public interest. The prosecution of this case is in the public interest. As Mr. Walters stated, there could be issues that get raised in compliance, but the NLRB does not walk away from a case because of changed circumstances. There still must be a recognition that an unfair labor practice has occurred and that there must be some sort of remedy for the unfair labor practice conduct. The scope of the scope agreement will be determined and its validity and applicability will be determined either one place or another, right? And if there weren't the 17 Ross employees, it would be determined through the procedures of the Railroad Labor Act. Your Honor, the NLRB is not seeking to deal with the jurisdiction of the work. But our concern and shouldn't, isn't the problem presented is does ALPA have the right to have its pilots fly ABX planes or not, pursuant to the agreement, the scope agreement? And who's going to decide that? With all due respect, Your Honor, they do not have that right because the agreement itself is an unlawful agreement. All right. And who should decide that? The NLRB? The NLRB has decided that for purposes of this case. Can't that be decided under the Railway Labor Act also and through the dispute in the district court? It certainly can't in terms of the aggrandizement of work which ALPA has sought in this case. That is an unlawful secondary boycott. It's not that the NLRB is trying to decide representational matters for, under the Railway Labor Act. Rather, it is the fact that the agreement is being interpreted and used as a sword. Okay. And who's going to decide the agreement? Who's going to decide the validity of the agreement? It already has been by the NLRB. So you're saying that ALPA, it has lost that already in terms of the NLRB? That's correct. It's as if two employers had an agreement that was violative of the antitrust laws. And the aggrieved party came to an arbitrator and said, let me get the benefit of my bargain. The answer is you can't have the benefit of the bargain of an unlawful agreement. The NLRB has determined that this agreement is unlawful. Okay. And we say they went to the wrong arbitrator. You needed to go to the other arbitrator. You needed to go to the arbitrator that would be determined by the fact that this is an RLA union and an RLA common carrier. And wouldn't that arbitrator also be able to determine the scope of the agreement or the validity of the agreement or the applicability of the agreement? Not at this stage. Well, not at this stage. That's what the NLRB order. We're saying the NLRB shouldn't have been in it in the first place. There was no jurisdiction. I'm sorry, Your Honor. So could it not then be determined? It presumably, if there were no labor organization under the Act at all and the NLRB couldn't determine it, presumably that would be between sole NLRA, excuse me, sole RLA employers and could go there. We would then have Jacksonville Terminal. And I note that in Jacksonville Terminal, the NLRB wasn't even involved in that case. It was used as a fence in that case. If you don't mind, let's take this back because I wanted to see how it played out. Let's assume that this had been resolved under the RLA and that the agreement had been upheld. Okay? Just hypothetically. What rights do you have at that point? Do you think that's the end of the game? Or do you have some rights under the NLRA to contest the secondary boycott? If there were still an NLRA employer and an NLRA labor organization and the statute requires that it be an organization in which employees participate, not one, but it has to be two or more, then the NLRB would have jurisdiction. Even if under the RLA the scope of the agreement had been affirmed? That's correct. In terms of the NLRA, and I might direct the Court's attention to an old Supreme Court case called Carey v. Westinghouse, which doesn't deal with RLA, but deals with the nuances of representation matters. And in that case, an arbitrator had already decided a particular issue. But the NLRB, late in the game, came in. And the Supreme Court recognized in Carey that once the NLRB comes in, its determination is supreme. And it trumps what had been determined by an arbitrator. Well, it's a little bit different because in Jacksonville the Supreme Court said the RLA predated the NLRA and therefore there are things within its jurisdiction. It seems to me if we're talking about the scope of an agreement that involves common carriers in this context, then the scope of the agreement has to be governed by the RLA. Don't you agree? If that's just the question, the scope of the agreement. It ordinarily would if we weren't dealing with an agreement to boycott another employer by a statutory labor organization. We can't divorce ourselves from those important facts as well. And if I can make just one final point to the Court, even though my time has expired, the Western Pacific case, which has been mentioned a couple of times, also doesn't involve the NLRB. It stood for the unremarkable proposition that Section 301 jurisdiction under the NLRA is not available for railway employers. It has nothing to do with this case. Thank you, counsel. Your Honors, there's an interesting Ninth Circuit case cited by the Western Pacific Railways case that I foolishly omitted from my brief. It's a Pan-American World Airways v. United Brotherhood of Carpenters, 324F2217, Ninth Circuit, 1963. In that case, we have the opposite situation.  The United Brotherhood of Carpenters, as you all know, is an airline, and the Carpenters Union, representing a group of workers who did work for Pan Am that had nothing to do with the transportation industry. In fact, the Court kept analogizing it to, you know, it's as if they are manufacturing shoes. And the same arguments were made because Pan Am said, well, we get to assert rights under the Railway Labor Act against this union. We get an injunction under the Railway Labor Act. And what did the Ninth Circuit say? It said, no, we have to look to the substance of the dispute. Even though Pan Am is a carrier, and these employees are technically employees of a carrier, this is not an RLA issue. This is an NLRA issue because this particular work has nothing to do with the airline industry. So the Ninth Circuit has repeatedly said what is important to do is to look at the substance of the dispute. And did ALPA concede that it is a labor organization? Yes. ALPA conceded that technically it meets the definition of a labor organization under the National Labor Relations Act. But what we see is that the Supreme Court has repeatedly focused not on the question of whether a union is technically a 100% pure RLA union or not, but rather whether it is or is not a traditional railway labor organization, which we all concede that ALPA is. Interestingly, counsel for ABX answered the question I failed to answer earlier about does it make any difference if it's 17 or 17,000 Ross workers, simply because counsel says, well, ALPA had to accept the reasonable consequences of its action. It decided to become a mixed NLRA, RLA union. Well, in fact, the record indicates that ALPA unwittingly allowed 17 of its members to transition from the pilots to transition from the RLA to the NLRA, because although they were still pilots, their employer started to work only for the federal government and therefore no longer a common carrier, no longer under the Railway Labor Act. To the extent that we want to... Well, we'll never do that again, will we? We will never do that again. Other unions like the Teamsters have a bigger problem because they represent both substantial numbers of pilots and substantial numbers of non-RLA employers. One of the shocking things about the result of the board in this case is that it impacts the rights not only of labor organizations or unions like ALPA, but of subcontractors and contractors who do business. It advantages subcontractors who do business only with pure RLA unions over mixed RLA unions, even in the airline or railroad field, because of their vulnerability to various strikes or other actions. We mentioned this in our reply brief. It creates these strange economic advantages and disadvantages and incentives that we think are far... There's no evidence that anyone ever intended, again, the 17 Ross pilots to have that kind of impact. I think ultimately we have to ask the question, what is the point here? Are we looking at an RLA dispute or an MLRA dispute? And to that you look at the essences of things, not technical definitions. There was a reference by earlier counsel to board member Liebman's dissent below at the board, and I think she put it far better than I could, when she said, in sum, the essence of the dispute in this case is between an RLA-covered employer and an RLA-covered union concerning RLA-covered union-represented employees. A federal court lawsuit to adjudicate the private party's respective rights under the RLA is pending. Let me note, it has now been pending for four years because of the intervention of the NLRB. The majority advances no persuasive reason or authority for asserting jurisdiction over the dispute, and Supreme Court precedent counsels against it. But she's, but that dissenting is saying we do have jurisdiction, but I don't think we should exercise it, which is different than not having jurisdiction under Jacksonville, right? You know, I don't actually read it that way. I think it's this question of technically they have jurisdiction over Alpo because of the 17 Ross pilots, but I read her overall dissent as saying it is not proper for the board to attempt to exercise jurisdiction because what is proper is for the board to attempt to look at the spheres of authority of the RLA and the NLRA, and I at least read Justice Board Member Liebman as saying it is not appropriate for us to attempt to interfere with an RLA dispute. Perhaps I'm splitting hairs. But Jacksonville would say you didn't, if it's a pure RLA dispute, that there was no jurisdiction, right? I think that's a fair reading of Jacksonville. And looking at the dissent, if she is saying the board shouldn't, but if the board did assert jurisdiction, is that the end of the issue? Is that? Well, I think she's saying the Supreme Court precedent counsels against them, and I think she can be a very diplomatic person at times, but I think she's saying this is wrong. This is not a proper exercise of the board's jurisdiction. So you should read her saying exercise discretion to really be saying you can't do it. You can't do it. And I think it's worth noting, I think you're all aware of this, that we don't, it's not appropriate to defer to the board's decision, discretion as to the limits of its authority vis-a-vis the Railway Labor Act. That's clearly a decision for you, not for the board members. Well, ABX seems to suggest that one could have, under the RLA, an enforcement of the contract. In other words, the scope of the contract means what it says, and yet one could still find an illegal secondary boycott that could be enjoined by the NLRB. Well, you couldn't, and everyone concedes, you couldn't were it not for those 17 Ross Aviation pilots. So in general, but yes, I mean, ABX is taking the same position as the board that because ALPA is technically a labor organization, the consequences that flow from that is it basically stripped of rights which it would have if it were not for those 17 pilots. I think you may have missed my question. Do you think it is permissible, for example, under the RLA, for the scope of the contract to be construed through arbitration, the normal RLA means, and yet the NLRB to have jurisdiction over the secondary effects of the construction of the contract? No, that's clearly unprecedented, and literally unprecedented in the RLA world. The NLRB does not get to come in and second-guess or evaluate contracts reached between traditional railway unions and carriers regardless of the collateral impacts of those agreements on neutral NLRA employers. And while there's a quibble about the extent to which Western Pacific is directly relevant, I submit that it is, there is no case, no court case that suggests that the collateral impact of an RLA dispute on, you know, the suppliers of food and the people that drive passengers to airports and the other people who are not covered by the RLA, if United Airlines, the unions at United Airlines go on strike and United Airlines is shut down, there are all kinds of collateral consequences. And in fact, we know that the union in that case is entitled to engage in secondary picketing and is entitled to go to NLRA employers and picket them to put secondary pressure on United Airlines. There is no question that the NLRB has no authority to stop that pure RLA union from picketing NLRA employers to put pressure on an RLA carrier because we know that it is an RLA dispute. It's a dispute between the carrier and its employees. So the only difference here is ultimately those 17 Ross Aviation pilots, and we submit that is not the kind of difference that the fundamental legal rights of an entity such as ALPA with 62,000 RLA covered employees should hinge on. Thank you, counsel. Thank you very much. The case just heard will be submitted and will be in recess for the morning. All rise. This court's decision stands adjourned.
judges: Roth , Thomas, Callahan